STARR v. LAPPLEY.

1. GIFTS—INTENT—BURDEN OF PROOF.
    Evidence presented in suit by 85-year-old plaintiff to set aside
        transfers of his interests in the estates of his 2 recently
        deceased bachelor brothers, together with a probate form of
        waiver of notice and consent, which he had given to a surviv-
        ing brother and children of another deceased brother *held*, not
        to sustain burden of proof on plaintiff's contention that he did
        not intend or desire to give all of his interest in the estates
        to defendants but that he knew he was making such transfers
        and wanted and desired to do so.

2. SAME—INTENT—TIME.
    Whether or not a transferor of property intended to make a gift
        is determined as of the time the transfer was made rather than
        what he may have subsequently desired.

Appeal from Kent; Hoffius (Stuart), J. Sub-
mitted April 2, 1963. (Calendar No. 2, Docket No.
49,525.) Decided July 17, 1963.

Bill by John J. Lappley against Henry B. Lappley,
Audley C. Lappley, and Beulah D. Frakes to set
aside deed and bill of sale conveying interests in
estates of his deceased brothers. Bill dismissed.
Plaintiff appeals, with case continued in the name
of John G. Starr, administrator of his estate.
Affirmed.

REFERENCES FOR POINTS IN HEADNOTES
[1] 24 Am Jur, Gifts § 115.
[2] 24 Am Jur, Gifts § 21.

*Cornelius Wiarda,* for plaintiff.

*Thomas D. Anderson, Sr.,* for defendants.

Kelly, J.   The bachelor brothers, William and Fred Lappley, were burned to death on March 29, 1958, at the farm where they lived.

They left no wills and their heirs were their brothers John (plaintiff) and Henry (defendant) and 2 children of their deceased brother George, defendants Audley C. Lappley and Beulah D. Frakes.

June 28, 1958, John Lappley (85 years old) executed 3 documents: (1) a quitclaim of all his interests in the real estate of his post-deceased brothers, granting 1/2 interest to his brother Henry and a 1/4 interest to each of the 2 children of his deceased brother George; (2) a bill of sale granting to defendants all his right, title and interest as heir-at-law of his 2 deceased brothers in the rest and residue of each of their estates; and (3) a probate form of waiver of notice and consent.

Administrators for the estates of William and Fred Lappley were discharged and vouchers filed on April 3, 1959.

In April, 1959, plaintiff instituted suit and on May 5, 1959, filed an amended bill of complaint seeking to cancel the deed and the bill of sale he had executed the previous June and, also, asked that the court decree the waiver he had signed be declared of no force and effect, alleging he had been defrauded by the defendants' misrepresentations that the estates were so small that after paying funeral expenses and claims there would be nothing left and that he signed the deed, receiving only $2 therefor, because of the fact he was informed such signature would save time, effort and expense, and that he

did not mean nor intend any gift of any part of his share in the estates.

Defendants answered denying fraud and alleging domination and control of John Lappley by a Mrs. Zuidema in whose home plaintiff had been living since he sold his farm in 1956, stating "that the claims of the plaintiff are in fact the claims of the person [Mrs. Zuidema] who has acquired other assets of the plaintiff."

Plaintiff filed an amended reply denying "that any other person is interested in this matter and denies that the claims of the plaintiff are in fact the claims of any other person."

At the conclusion of proofs the trial court denied plaintiff relief holding that plaintiff had failed to sustain the burden of proof.

In May, 1961, plaintiff was and had been for 2 years living in Florida, residing there with Mr. and Mrs. Zuidema. His deposition was taken at this time and place. This deposition, plus the documentary evidence of the register of deeds and the probate register, was the only evidence introduced to sustain plaintiff's burden of proof.

In this deposition plaintiff repeatedly, on direct examination, testified he did not read the documents before signing; that the documents were not read to him; that he didn't really understand what the papers were; that he did not know he was signing a deed, a bill of sale, or a waiver; that Mr. Armstrong gave him $2, saying Henry and Audley wanted him to sign the papers; that they said it would save them a lot of trips if he would sign the papers, and "would help them from driving down to my aunt's (at Grand Rapids)." His deposition further read:

"*Q.* Why would it be to your aunt?

"*A.* Well, I couldn't tell you. Because I made my home there, and she took care of me, and anything

—when I wanted to go in anywhere, she would come and take me, help me get papers out for the farm and stuff, so what could I do? I was there alone, homeless. I'll tell you it was many a day, boys, I cried, alone, I didn't know— * * *

"*Q.* Then, did you sign those papers?

"*A.* Yes. * * *

"*Q.* Did you know what those papers were?

"*A.* No.

"*Q.* Was there any talk about what the papers were?

"*A.* No. * * *

"*Q.* Aside from this talk that it would help them so they wouldn't have to go to Grand Rapids so often, was there anything else said about them?

"*A.* No.

"*Q.* You knew they related to your brothers', your dead brothers' estates, didn't you?

"*A.* Well, some thinks I did and some thinks I didn't. * * *

"*Q.* After you returned home from visiting Audley and Henry did you have occasion to talk about that with anybody?

"*A.* No.

"*Q.* Did you tell anybody about what you did?

"*A.* No, I didn't know anybody there. * * * They were all strangers to me. * * * The neighbors. * * * In town. * * *

"*Q.* You didn't talk to any neighbors about it?

"*A.* No.

"*Q.* But how about Henry and Jeannette?

"*A.* Well, we didn't talk about it much. We said we would wait and see what you was going to do. * * * Near as I could find out, I told them, I said to them, I says, go ahead, I am done; I can't do nothing more for you. You know what I mean? * * *

"*Q.* What were you thinking of or what did you mean by that?

"*A.* Well, I got so nervous, I told you I got so nervous, that I could fly almost some of these days;

so I told my aunt, I got to quit thinking about these things or one day I'll go crazy.

"*Q.* I see.

"*A.* But she kept worrying me to death.

"*Q.* So there was nothing done about going back to Henry or Audley or Beulah?

"*A.* No, not a thing."

The 3 defendants testified in their behalf and also called to the witness stand 6 other witnesses.

Defendant Audley Lappley (plaintiff's nephew) testified that he was residing in Florida, was a bachelor 51 years of age, and in June visited his uncle (defendant Henry B. Lappley) at his home, and while there his uncle decided he wanted to visit his brother John in Grand Rapids and that he drove with him to the Zuidemas' home in Grand Rapids where John was residing; that they did not intend to invite John to return with them, but in the course of the conversation the suggestion was made and John decided to return; that John remained at his brother Henry's home for a period of about 2 weeks, but that after he was there about 3 or 4 days, he (witness) said, "Well, Uncle John said that he wanted to sign off all rights of the property and personal property and real estate and if we had the papers, he would sign them all.   *   *   *   He said that he had all he wanted; that he had plenty to keep him, more than enough to keep him and that he didn't need it and he wanted it to go to us"; that after the attorney had prepared the papers and before going to Mr. Armstrong's farm to have the deed signed and notarized, his uncle John had him drive him to Silver Lake to visit John's friend, Mrs. Kerwin; that after John had introduced Mrs. Kerwin to his Uncle Henry and himself, he "told her he was going to sign off all the property rights," and "she said, 'Uncle John, do you know what you are doing? Is that what you want to do?' He said,

'Yes, that is what I want to do. I have all that I want and I have all I need' "; that he knew his deceased uncles owned their farms but did not know the extent of their estates, and he stated, "There is no reason he (John) shouldn't know and I am sure he did. The uncles were close together. They would know whether each other owned their own farm"; that it was Uncle John's idea that they go to the Armstrong farm because "Uncle John knew Armstrong. He had dealings with him in real estate and he knew the man and he wanted to go to him."

Mrs. Kerwin testified that John Lappley lived for 15 years across the road from her farm and that he stopped to visit on his way to Armstrong's farm and, after introducing her to his brother and nephew, he stated:

" 'They are taking me around for a ride. Isn't it nice? I am staying with them for a couple of weeks.'

"And I said, 'That is lovely, John. Where are you going?'

"He said, 'Oh, around to different places. I am on my way over to Mr. Armstrong now.' * * *

"And we talked on different subjects and he said, 'You heard about my brothers dying, didn't you?'

"And I said, 'Yes, and you have my sympathy, John.'

"He said, 'I want to go over and see Armstrong. I got some papers here that I want to talk about. It is something that I would like to make right. You know, I want to see that my brothers are taken care of.' "

It is evident from the trial court's opinion that he was impressed by the testimony of Mr. and Mrs. Armstrong and this Court shares his judgment in that regard. Mr. Armstrong had never met defendants Henry and Audley Lappley previous to the occasion when the deed was signed. Mr. Armstrong

testified that after talking about his brothers' deaths John said that "he was signing his estate over to his brother, nephew and niece. He asked me what I thought about it. I told him that I didn't figure it was any of my business and it was a family affair and I asked him what he thought about it and he said, 'Well, I figure I got money enough to take care of me.'" Further, that he read the deed over to John Lappley, word for word, and then asked him if he knew he was "'signing away all the share of your estate'" and he answered, "'Yes'"; that he wanted to keep it in his own family and "he said, 'I have got money enough to take care of me for the rest of my life.'" Mr. Armstrong testified that he also read over and explained to Mr. Lappley, word for word, the bill of sale and the probate court waiver.

Mrs. Armstrong corroborated her husband's testimony.

Defendant Beulah D. Frakes testified that the Saturday after her uncle signed the deed he visited her at the lake and informed her he had "'signed off the estate,'" and warned her "'Watch it, you may have trouble,'" and said, "'I will tell you, I got all I need to take care of me. I got at least $30,000 and that is all I need to take care of me.'"

Defendant Henry B. Lappley gave the following testimony concerning plaintiff's signing of his interest in the estates:

"*Q.* And then after he came to your house, it has been brought out here that you and Audley took him down to Mr. Armstrong's. Now, will you tell us what led up to the taking him down to Mr. Armstrong?

"*A.* Well, I was sitting on the back porch 1 morning and he came around and went around and looked at the roses and he said, 'Henry, I want to sign off.'

"I said, 'John, do you want to sign off?'

"He said, 'Yes, I do. I want to see that you and Beulah and Audley get that money.'

"He said that he would give Jeannette over $30,000 and he said that they ought to be able to take care of him for that.

"*Q*. Was anything said between you and he relative to the value of the 2 brothers' estates?

"*A*. He asked me what the farm was worth. I said, 'John, you sold your own farm and you know more about that than I do, what the farm is worth.' "

Floyd Demond was called as a witness for the defense. He testified he had known plaintiff for approximately 20 years and after plaintiff had sold his farm at Silver Lake he had a discussion with him in regard to the sale and said, "Well, he told me that he sold it for $18,000 and I said, 'Well, John, how are you going to invest this money?' And he said, 'Jeannette put it in the church and then I wouldn't have to pay taxes on it.' * * * I suppose she said to buy church bonds or anything." He further related a conversation he had with plaintiff in regard to business affairs just before plaintiff left to go back to Florida, at which time plaintiff said: " 'I have got all I need to take care of me the rest of my life as far as that is concerned. I signed off. I don't want to be bothered with it. I got enough to keep me all my life anyway. * * * I don't want it. I don't want to be bothered with it. The others need it worse than I do.' " And when asked who he meant by "the others" the witness answered, "His niece and nephew."

Floyd Demond's wife also testified that she had a conversation with plaintiff in regard to his deceased brothers' property between the time of the brothers' deaths and the time plaintiff left for Florida, and stated: "Well, he said that his brothers left some property and that he would sign it off, because he said it was too much and he didn't want to have

anything to do with it and he wanted to leave it in the family."

The main question presented for decision, both on the trial court level, and in this Court, is whether the record sustains plaintiff's contention as disclosed by the following question and answer:

"*Q.* Did you mean to give Audley and Beulah and Henry your dead brothers' estates?
"*A.* No."

Plaintiff's deposition in its entirety is far from satisfactory and his statement that he did not intend to give his shares to Audley, Beulah, and Henry stands on the record uncorroborated.

As against plaintiff's statement, we have the testimony of Mr. and Mrs. Armstrong, testimony that is clear and unequivocal, not contradicted and not explained in any way by appellant. Plaintiff selected Mr. Armstrong to witness and notarize the execution of the quitclaim deed, the bill of sale, and the waiver, and Armstrong had never even met defendants before they accompanied plaintiff to his farm. Mr. Armstrong read *every word* of the 3 instruments to plaintiff.

Add to the Armstrong testimony the unimpeached and unexplained testimony of the disinterested witnesses, plus the testimony of the 3 defendants, and this Court concludes that not only did plaintiff fail to sustain his contention that he did not intend or desire to give all of his interest in the estates to defendants, but, to the contrary, defendants established the fact that plaintiff knew he was making such a transfer and wanted and desired to do so.

Plaintiff testified that defendants informed him there would not be much of anything remaining in the estates after paying funeral bills and expenses, and appellant claims that this testimony, plus the fact defendants did not inform plaintiff as to the

extent of the personal estates, constituted misrepresentation and fraud entitling plaintiff to recover from defendants the sum of $27,075.26, with interest at 5% from and after April 3, 1959.

Defendant Beulah D. Frakes testified as follows:

"*Q.* Did you see John before he signed this deed and bill of sale that are exhibits here?

"*A.* No.

"*Q.* You didn't see him until afterward?

"*A.* I saw him afterwards, yes. He came over on a Saturday, the following Saturday. He came to the lake.

"*Q.* Did he say anything to you about it?

"*A.* Yes, he did. I had company that weekend, my husband's brother and family was there and we were sitting alone out on the porch and he says to me, he says, 'Beulah, I have signed off the estate. I understand they are going to appoint you as administratrix.'

"And he said, 'I signed off the estate, Beulah. Watch it, you may have trouble.'

"I don't know what he meant by that, but that is what he said and he asked me if I had any idea of the value of this estate and I says, 'Well, not exactly. You know what the farms are worth as much as I do.'

"I also said, 'We will have to have them appraised because I don't know what the value of the land is around there and we would have to have that done.'

"And I said, 'As far as stocks and bonds I am only estimating it, but I judged they were worth approximately $20,000 apiece, in stocks and bonds.'

"And he said, 'Well, they always was very conservative and never went any place.'

"He says, 'I will tell you, I got all I need to take care of me. I got at least $30,000 and that is all I need to take care of me.'

"*Q.* This conversation took place after he had signed the deed and the bill of sale?

"*A.* That's right.

"*Q.* You didn't talk to him at all about it before that?

"*A.* No.

"*Q.* Now, have you seen or visited with John Lappley since this suit was started?

"*A.* No."

Plaintiff did not claim in his deposition that he signed the papers because he was led to believe his brothers left estates barely sufficient to pay burial expenses, but, to the contrary, he testified that he did not know what he was doing or signing and did not intend to transfer at any time any part of his rights to defendants.

The record does not disclose that plaintiff was concerned with the extent or size of his brothers' estates. The record justifies a conclusion that plaintiff, who was the oldest of the brothers and 85 years of age at the time of execution of the instruments, felt that he had all the money he needed for the rest of his life and desired that his share in the estates go to his brother and the 2 children of his deceased brother, and that he was not misled by the failure of his brother or nephew to advise him as to the personal estates of his deceased brothers.

The record discloses that at the time plaintiff signed the deed, the bill of sale and waiver, he appeared in full control of his faculties and witness Armstrong was questioned in this regard as follows:

"*Q.* Now, wasn't John nervous?

"*A.* I didn't think he acted very nervous to me.

"*Q.* Wasn't he upset?

"*A.* I wouldn't think he was."

An examination of the deposition taken 3 years later, when plaintiff was 88 years old, discloses that these 3 years had taken their toll, resulting in a deposition that justified the trial court to state in his opinion that:

"At the time he did it is the time that we have to look at it—not what does he want today, but what did he want on that day and what was his intent. * * * I am of the opinion that the plaintiff has not carried the burden in order to set aside a deed, the bill of sale, the waiver of notice and consent which was executed."

Affirmed. Costs to appellees.

CARR, C. J., and DETHMERS, BLACK, KAVANAGH, SOURIS, SMITH, and O'HARA, JJ., concurred.